_____ FILED _____ ENTERED
_____ LOGGED _____ RECEIVED

12:34 pm, Dec 20 2022
AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____Deputy

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**(SOUTHERN DIVISION)**

UNITED STATES OF AMERICA      *

         v.          *      Criminal Case No. 8:21-po-02263-AAQ

TAFFARI J. MARIQUE      *

## MEMORANDUM OPINION

This case concerns the alleged possession of a firearm on government property in violation of 45 C.F.R. § 3.42(g). Before the Court is Defendant Taffari J. Marique's Motion to Dismiss. ECF. No. 23. For the reasons discussed below, Mr. Marique's Motion to Dismiss shall be DENIED.

## BACKGROUND

According to the United States' allegations against him, on June 22, 2021, Defendant Taffari J. Marique drove to the National Institutes of Health (NIH) and entered the commercial inspection lane to report for work. ECF No. 23, at 2. Before he was admitted, NIH security officers recovered a handgun from the glove compartment of his car. *Id.* Mr. Marique was then arrested and issued a citation for violating 45 C.F.R. § 3.42(g). ECF No. 1. He was subsequently released. ECF No. 23, at 2.

On December 1, 2021, Mr. Marique had his initial appearance. ECF No. 2. On August 1, 2022, he filed a Motion to Dismiss, arguing that his conduct was protected by the Second Amendment under the new framework announced by the Supreme Court in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). ECF No. 23. The Government filed a Response to Mr. Marique's Motion on August 30, 2022. ECF No. 30. Mr. Marique filed a reply

1

to the Government's Response on September 27, 2022.  ECF No. 34.  A bench trial is currently scheduled for December 20, 2022.  ECF No 28.

## LEGAL STANDARD

Under Federal Rule of Criminal Procedure 12, the court should dismiss criminal charges "where there is an infirmity of law in the prosecution[,]" including where the underlying statute is unconstitutional.  *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012).  Mr. Marique argues that § 3.42(g) is facially unconstitutional because it infringes on behavior protected by the Second Amendment.  ECF No. 23, at 2.  "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."  *United States v. Salerno*, 481 U.S. 739, 745 (1987).

## DISCUSSION

Mr. Marique has challenged 45 C.F.R. § 3.42(g), arguing that the regulation is unconstitutional under the Supreme Court's recent decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).  In pertinent part, 45 C.F.R. § 3.42(g) states:

> No person other than a specifically authorized police officer shall possess firearms, explosives, or other dangerous or deadly weapons or dangerous materials intended to be used as weapons either openly or concealed [on the NIH campus].

45 C.F.R. § 3.42(g).

## I.   The Law after *Bruen*

The Second Amendment states, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  Over the last two decades, three Supreme Court cases have interpreted the Second Amendment to provide individual protections to possess and use firearms: *District of Columbia v.*

2

*Heller*, 554 U.S. 570 (2008), *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010), and *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).  In *Heller*, the Court found that the Second Amendment protected an individual's right to keep and bear arms.  554 U.S. at 595.  In *McDonald*, the Court held that the Second Amendment applies to the states through the Fourteenth Amendment's Due Process Clause.  561 U.S. at 767-68.  After *Heller* and *McDonald*, Courts of Appeals generally applied a two-step test to determine whether a challenged law was constitutional:

> [t]he first question is whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee.  This historical inquiry seeks to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification.  If it was not, then the challenged law is valid.  If the challenged regulation burdens conduct that was within the scope of the Second Amendment as historically understood, then we move to the second step of applying an appropriate form of means-end scrutiny.

*Woollard v. Gallagher*, 712 F.3d 865, 875 (4th Cir. 2013) (citing *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010)).  This two-step test was abrogated in *Bruen*, which rejected the lower courts' use of means-end testing and interest balancing.  142 S. Ct. at 2129-30.  Instead, the Court instructed lower courts to focus on history – first, asking whether the statute prohibits conduct that is protected by the Second Amendment's plain text.  If the statute prohibits protected conduct, it is presumptively unconstitutional unless the Government can show that the limitation is "consistent with the Nation's historical tradition of firearm regulation."  *Id.* at 2130.  The test requires analogical reasoning, asking lower courts to thread the needle between "[upholding] every modern law that remotely resembles a historical analogue" and striking down all laws that lack a precise historical twin.  *Id.* at 2133.

3

Perhaps aware that the abrogation of the two-step test would raise some questions regarding the constitutionality of existing firearm regulations, the Court was careful to incorporate certain familiar paths for regulating weapons.  *See United States v. Minter*, No. 3:22-CR-135, 2022 WL 10662252, at *3 (M.D. Penn. Oct. 18, 2022) ("The Supreme Court in *Bruen* took great effort to not undermine its prior decisions in *Heller* and *McDonald* and to repeatedly underscore the continued validity of those decisions."); *id.*, at *4 ("This observation in *Bruen* is entirely consistent with *Heller*'s recognition of the legality of . . . 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings . . . '" (quoting *Heller*, 554 U.S. at 626-627)).

For example, *Bruen*, *McDonald*, and *Heller* preserved the idea that the government could "[impose] conditions and qualifications on the commercial sale of arms."  *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (quoting *McDonald*, 561 U.S. at 786, and *Heller*, 554 U.S. at 626-27).  This structure "makes sense because commercial regulations that apply only to manufacturers and sellers do not implicate an individual's right of possession."  *United States v. Price*, No. 2:22-cr-00097, 2022 WL 6968457, at *2 (S.D. W. Va., Oct. 12, 2022).  A district court addressing one of these laws post-*Bruen* held that the "natural reading of 'keep and bear arms' does not include the ability to sell or transfer firearms unrestricted," so commercial regulations do not impede rights covered under the Second Amendment's plain text.  *United States v. Tilotta*, No. 3:19-cr-04768-GPC, 2022 WL 3924282, at *6 (S.D. Cal. Aug. 30, 2022).

Additionally, and more relevant to this case, the Court in *Bruen* affirmed the use of the "sensitive places" doctrine.  When explaining the new test, the Court specifically reaffirmed "'longstanding' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings[,]'" discussed in *Heller*.  *Bruen*, 142 S. Ct. at 2133 (quoting *Heller*, 554 U.S. at 626).  The court validated such laws because "[a]lthough the historical record yields

relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited – *e.g.*, legislative assemblies, polling places, and courthouses – we are also aware of no disputes regarding the lawfulness of such prohibitions." *Bruen*, 142 S. Ct. at 2133.  *Bruen* called for courts going forward to apply analogical reasoning to places beyond schools and government buildings, resulting in an expansive, but not limitless interpretation of what a sensitive place could be. Accordingly, while the Court rejected New York's argument that all places of public congregation could be considered sensitive places, the Court encouraged lower courts to "use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible."  *Id*. Notably, the Court declined to "comprehensively define" sensitive places, only saying that New York had gone too far.  *Id*. at 2133-34.  In his concurrence, Justice Kavanaugh also highlighted the language in *Heller* and *McDonald* affirming the constitutionality of longstanding laws "forbidding the carrying of firearms in sensitive places such as schools and government buildings" and noting that the Court "identif[ies] these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive."  *Id*. at 2162 (Kavanaugh, J., concurring).

What little case law there is interpreting the "sensitive places" doctrine suggests an understanding of sensitive places in the context of firearms regulation extending beyond the specific types of government facilities which the Court named.  Before *Bruen*, courts upheld charges for carrying weapons onto federal facilities in part justified by *Heller*.  In *United States v. Giraitis*, the court upheld 18 U.S.C. § 930(e)(1), which barred carrying dangerous weapons into Federal court facilities.  127 F.Supp.3d 1, 3 (D.R.I. 2015).  In so holding, the court cited to the language in *Heller* describing "government buildings as 'sensitive places' where firearm possession has historically been regulated."  *Id*. (citing *Heller*, 554 U.S. at 626).  Similarly, in

*United States v. Dorosan*, the court upheld 39 C.F.R. § 232.1, which barred carrying dangerous weapons onto postal property, in part because it fell within *Heller*'s accepted longstanding prohibition on carrying firearms in sensitive places.  No. 08-042, 2008 WL 2622996, at *6 (E.D. La. June 30, 2008).  As the court said, *Heller* did not implicate or invalidate "gun control regulations banning possession of 'arms' *on federal property*."  *Id*.  Rather, *Heller* focused on laws that amounted to total bans and left ample space for regulations that "[fall] within the *Heller* Court's category and non-exhaustive list of [accepted] longstanding prohibitions on carrying firearms – *i.e.*, 'sensitive places such as schools and government buildings.'"  *Id*. (quoting *Heller*, 554 U.S. at 626).  As discussed *supra*, this is the language that *Bruen* specifically quoted, affirming that the reasoning in these two cases remains valid after *Bruen*.

Post-*Bruen* case law has been consistent on this point.  After the Court struck down New York's licensing and regulation scheme in *Bruen*, the state passed a new law incorporating the Court's guidance.  In pertinent part, the new law restrains the right to carry a firearm in "any place owned or under the control of federal, state or local government, for the purpose of government administration, including courts."  NY Penal § 265.01-e(2)(a).  This new scheme was challenged in *Antonyuk v. Hochul*, in which plaintiffs alleged that the new regulation was also unconstitutional.  No. 1:22-cv-0986 (GTS/CFH), 2022 WL 5239895 (N.D.N.Y. Oct. 6, 2022).  The court denied an application for a TRO against the portion of the law prohibiting firearms in government buildings, finding such a limitation was permissible because "the Supreme Court has already expressly acknowledged the permissibility of these restrictions."  *Id*., at *14 (citing *Bruen*, 142 S. Ct. at 2133).

The court's decision in *Antonyuk* also suggests that laws regulating government buildings may not require lower courts to engage in the same level of historical analysis as for other types

of firearm regulations.[1]  While the court found defendants had not met their burden on other parts of the law because they failed to provide historical analogues, the court did not require comparable analogues for government buildings because of the express acknowledgements in *Heller* and *Bruen*.  *See id.*, at *14 ("Fortunately, the Court need not collect in a footnote citations to the many historical analogues restraining the right to carry a firearm in 'any place owned or under the control of federal, state or local government, for the purpose of government administration, including courts' . . . .  This is because the Supreme Court has already expressly acknowledged the permissibility of these restrictions.").  The court used a similar standard to deny a TRO against the State's prohibition on carrying firearms in polling places without a robust historical showing.  *See id.*, at *15 ("Just as common in the historical record as the exception for government buildings . .

---

[1]  Some courts which have found that *Bruen* did not invalidate regulations prohibiting the possession of firearms by persons with prior felony convictions have likewise found that a robust historical analysis was not required.  *See Minter*, 2022 WL 10662252, at *4 ("[T]he Court here need not engage in an original analysis of whether the Second Amendment's plain text covers the possession of a firearm by a felon . . . where the Supreme Court in *Bruen* has already signaled the answer to this question."); *Price*, 2022 WL 6968457, at *8 ("I do not find it necessary to engage in the historical analysis test articulated in *Bruen* as to 18 U.S.C. 922(g)(1). Rather, I am convinced that the Supreme Court left generally undisturbed the regulatory framework . . . in *Heller* and *McDonald*.  [Defendant] essentially argues that *Bruen* should be taken to 'cast doubt on longstanding prohibitions on the possession of firearms by felons,' which is a marked departure from *McDonald* and *Heller* that was specifically not taken by the Supreme Court in *Bruen*."); *United States v. Jackson*, No. 21-51 (DWF/TNL), 2022 WL 4226229, at *2 (D. Minn. Sept. 13, 2022) ("While Jackson would like this Court to scrutinize the history of felon-in-possession statutes, such examination is unnecessary at this time.").  *But see Range v. Attorney General United States*, 53 F.4th 262, 271 (3rd Cir. 2022) ("*Bruen* still requires us to assess whether the Government has demonstrated through relevant historical analogues that § 922(g)(1) 'is consistent with this Nation's historical tradition of firearm regulation.'").  However, courts have engaged in a robust historical analysis to strike down laws that prohibited individuals from possessing firearms if they had been indicted, but not yet convicted, of a crime.  *See United States v. Stambaugh*, No. CR-22-00218-PRW-2, 2022 WL 16936043, at *3-6 (W.D. Okla. Nov. 14, 2022); *United States v. Holden*, No. 3:22-CR-30 RLM-MGG, 2022 WL 17103509, at *4-5 (N.D. Ind. Oct. 31, 2022).

. is the exception for locations being used as a polling place . . . (internal quotation marks omitted)).[2]

## II.     Application

In his Motion to Dismiss, Mr. Marique argues that the conduct prohibited by § 3.42(g) is protected by the Second Amendment's plain text, that there is insufficient historical tradition barring individuals from possessing firearms in government buildings like NIH, and the "sensitive places" doctrine is merely unsupported dicta.  ECF No. 23, at 10-13.  In response, the Government argues that the United States has plenary power to set the rules for what occurs on its property, that Mr. Marique has diminished Second Amendment rights because of his status as a government contractor, and that Mr. Marique's challenge fails under the test established in *Bruen* because there is extensive regulation of firearms in government buildings that the Supreme Court has upheld. ECF No. 30, at 1-2.  After evaluating the challenged regulation in the context of the law described above, I agree with the United States' third argument.

### A.  The Plenary Power of the United States Does Not Allow It to Ignore Constitutional Rights.

The United States' primary argument, that its plenary power "wholly undermines the defendant's claim and should end the matter," overstates its position.  ECF No. 30, at 1; *see also id.*, at 6 ("As the landowner, the government has the *absolute* right to exclude and manage persons on its lands.") (emphasis added).  Neither of the Second Amendment cases the United States cites

---

[2] The court later denied the plaintiffs' motion for a preliminary injunction against the pieces of the regulation prohibiting concealed carrying of a firearm in "any place owned or under the control of federal, state or local government, for the purpose of government administration," finding that plaintiffs lacked standing since none of them alleged an intention to carry concealed weapons in any of the listed locations in the immediate future.  *Antonyuk v. Hochul*, No. 1:22-cv-0986 (GTS/CFH), 2022 WL 16744700, at *11-12 (N.D.N.Y. Nov. 7, 2022).

supports this broad-sweeping proposition.  Rather, the fact that the alleged infraction occurred on government property was an additional basis to define "sensitive places" to include the property at issue, *see United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019) ("In sum, because the Maryland Avenue lot has been set aside for the use of government employees, is in close proximity to the Capitol building, and is on land owned by the government, we consider the lot as a single unit with the Capitol building, and conclude that the lot is a "sensitive" place where firearms prohibitions are presumptively lawful."), or one of multiple reasons which together established that the government had an interest in the regulation for the purposes of a balancing test.  *See United States v. Masciandaro*, 638 F.3d 458, 473 (4th Cir. 2011) (noting that the government's ownership interest in the property supports its position that it has a substantial interest in regulating the property as required to satisfy intermediate scrutiny).

Likewise, the sole case from outside the Second Amendment context involving constitutional rights that the United States cites turned on the scope of the constitutional right at issue, not the sweeping proposition that the United States may ignore constitutional rights if they do so on federal property.  *See Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 449 (1988) ("In neither case . . . would the affected individuals be coerced by the Government's action into violating their religious beliefs; nor would either governmental action penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens.").  In fact, the Supreme Court in *Lyng* went on to specifically reject the United States' present argument, explaining that had the government taken other actions, they would be prohibited even if the action occurred on federal land.  *See id.* at 453 ("The Constitution does not permit government to discriminate against religions that treat particular physical sites as sacred,

and a law prohibiting the Indian respondents from visiting the Chimney Rock area would raise a different set of constitutional questions.").

None of the other cases from other contexts that the United States cites support the broad proposition the government advances. The cases concerned whether the Constitution provided a source of authority for the regulation at issue, *Kleppe v. New Mexico*, 426 U.S. 529, 539-40 (1976), *United States v. City and County of San Francisco*, 310 U.S. 16, 19 (1940), or did not involve an alleged infringement upon an individual's or a group's constitutional rights. *See Utah Power and Light Co. v. United States*, 243 U.S. 389, 411 (1917) (explaining that the defendants had "been occupying and using reserved lands of the United States without its permission and contrary to its laws"); *Camfield v. United States*, 167 U.S. 518, 522 (1897) (involving defendants' enclosure of "public lands of the United States to the amount of 20,000 acres, and there is nothing tending to show that they had any claim or color of title to the same, or any asserted right thereto under a claim made in good faith under the general laws of the United States"); *United States v. Moriello*, 980 F.3d 924, 933 (4th Cir. 2020) ("Moriello summarily asserts that '[t]he challenged regulations interfere with [her] rights as a private citizen to disregard unwarranted exercise of authority.' (internal citations omitted)).

**B. The Government May Not Limit the Constitutional Rights of its Contractors When Acting as Sovereign.**

The United States also argues that the application of § 3.42(g) against Mr. Marique is constitutional because he was acting as a government contractor and contractors have diminished expectations of their constitutional rights. ECF No. 30, at 6. This argument is similarly unavailing. Even though Mr. Marique was acting pursuant to his job as a government contractor when he entered the NIH campus, his status as a contractor does not allow the Government to criminally sanction his carrying of firearms under the facts of this case.

When public employees act pursuant to their official duties, they lack some of the constitutional protections afforded to them when they act in their private lives. *Garcetti v. Ceballos*, 547 U.S. 410, 416 (2006). This is to avoid constitutionalizing some workplace grievances and internal concerns that would hinder the government's ability to manage its employees, since "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions." *Id.* at 418. In this respect, independent contractors are treated similarly to government employees. *Board of Cnty. Com'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 684 (1996).

These limitations apply only when the government acts as an employer; they do not limit an employee's ability to avail themselves of constitutional protections when the government is acting as a sovereign. *See Engquist v. Oregon Dept. of. Agr.*, 553 U.S. 591, 598 (2008) (finding, in the context of the First Amendment, that "there is a crucial difference, with respect to constitutional analysis, between the government exercising 'the power to regulate or license, as lawmaker,' and the government acting 'as proprietor, to manage [its] internal operation.'") (citing *Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886, 896 (1961)); *Garcetti*, 547 U.S. at 418 ("[T]he Court has recognized that a citizen who works for the government is nonetheless a citizen . . . So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively."); *Waters v. Churchill*, 511 U.S. 661, 671 (1994) ("[T[he government as employer indeed has far broader powers than does the government as sovereign" when regulating the speech of employees); *O'Connor v. Ortega*, 480 U.S. 709, 721-22 (1987) (plurality opinion) (finding that the Fourth Amendment does not require warrants prior to conducting a search of a public employee's office because the government as employer has broader powers than the government

as sovereign); *Pickering v. Bd. of Ed. of Tp. High School Dist. 205, Will Cnty., Ill.*, 391 U.S. 563, 568, 574 (1968) (holding public employees do not surrender all of their First Amendment rights when they accept government employment and may speak freely when addressing matters of public concern).

While the Supreme Court has not addressed this standard in the context of the Second Amendment, district courts have employed the "employer/sovereign" distinction when addressing Second Amendment claims.  In *Miller v. Smith*, which the government primarily relies on, ECF No. 30, at 8, the court upheld a contractual requirement that plaintiff foster parents keep any firearms and ammunition in foster homes "stored and locked up separately at all times and kept in places inaccessible to children."  No. 18-CV-3085, 2022 WL 782735, at *1-2 (C.D. Ill. Mar. 14, 2022).  The court found this permissible because, as government contractors, plaintiffs could be required to accept certain restrictions to their Second Amendment rights as part of their employment.  *Id*. at *12.  The court in *Miller* recognized that the government was acting as an "employer" as opposed to a "sovereign," explicitly stating that the plaintiffs "c[ould], at any time, escape the application of the Foster Home Rule by giving up their foster caregivers' license."  *Id*., at *12; *see also Farneski v. Cnty. of Hunterdon*, 916 F.Supp.2d 573, 585 (D.N.J. 2013) (finding that there was no Second Amendment violation where a police chief ordered a police officer to turn in his firearms because it was within his supervisory power) (referencing *Maslow v. City of Atlantic City*, No. 08-3618 (JEI), 2011 WL 4859286, at *5 (D.N.J. Oct. 12, 2011) (same); *Montalbano v. Port Authority of New York and New Jersey*, 843 F.Supp.2d 473, 481 (S.D.N.Y. 2012) (finding that it was permissible under the Second Amendment for the Port Authority to limit "Montalbano's possession of a firearm to on duty possession as a condition of his employment" because the "Port Authority did not categorically bar Montalbano from keeping a firearm at home

for self-defense" and because "allowing an officer to be armed and unsupervised when the officer had a prior domestic incident, would severely undermine the Port Authority's ability to 'operate efficiently and effectively' in providing security to the public.") (quoting *Garcetti*, 547 U.S. at 419).

Here, Mr. Marique's prosecution is not linked to his employment, but rather to his presence on the NIH campus. The regulation at issue, § 3.42(g), is not a contract term or a workplace policy. *Cf. Umbehr*, 518 U.S. at 685 (finding that the government could permissibly cancel an independent contractor's contract because of his speech without violating the First Amendment if certain conditions were met); *Miller*, 2022 WL 782735 at *12 (finding that the government could limit the ability of foster caregivers to possess firearms without violating the Second Amendment because they "accepted these burdens and restrictions in exchange for the benefits of licensure."). Instead, it is a regulation that applies to everyone on the NIH campus regardless of their employment status, as demonstrated by other litigation in the District in which identical citations were given to those not working under government contract. *See United States v. Tallion*, No. 8:22-po-01758-AAQ, ECF No. 19, (D. Md. Dec. 13, 2022). Likewise, the proposed punishment is not termination or suspension by a supervisor, but rather criminal citation and arrest by a law enforcement officer. *Cf. O'Connor*, 480 U.S. at 721-22 (plurality opinion) (finding that the government could search an employee's office without a warrant and use material found in the search in his termination hearing without violating the Fourth Amendment and distinguishing between police, who "conduct searches for the primary purpose of obtaining evidence for use in criminal or other enforcement proceedings" and employers, who "most frequently need to enter the offices and desks of their employees for legitimate work-related reasons wholly unrelated to illegal conduct."); *Bishop v. Wood*, 426 U.S. 341, 350 (1976) (finding that the Due Process Clause

13

does not protect a public employee from discharge that was "incorrect or ill-advised."). Based on these factors, it is apparent that the government is proceeding against Mr. Marique as a sovereign against a general resident, rather than as an employer against an employee. To whatever extent government contractors may have reduced Second Amendment rights in the workplace, such a diminished standard does not apply here.

### C. Mr. Marique's Behavior May Not Be Covered Under the Plain Text of the Second Amendment.

Under *Bruen*, the first step is to determine whether the Second Amendment's plain text covers the conduct at issue. In this case, the question is whether the Second Amendment includes a right to carry weapons onto government complexes like the NIH campus.

Mr. Marique argues that the Second Amendment covers his conduct because it secures the right of the people to keep and bear arms; since Mr. Marique is a person and was carrying a handgun, a "quintessential 'arm' for Second Amendment purposes," he says his conduct is protected. ECF No. 23, at 10 (citing *Heller*, 554 U.S. at 628-39). Mr. Marique alleges that, after *Bruen*, the right to bear arms "naturally encompasses public carry" since the purpose of the Amendment is to "guarantee[] an individual right to possess and carry weapons in case of confrontation, and confrontation can surely take place outside the home." ECF No. 23, at 11 (citing *Bruen*, 142 S. Ct. at 2134). In response, the Government argues that Mr. Marique's conduct is not covered by the Second Amendment because, as interpreted by *Heller* and *Bruen*, the Second Amendment protects a right to "carry a firearm for protection in the general public" and that Mr. Marique was carrying a firearm onto a "highly regulated, closely-scrutinized, heavily guarded government research facility" rather than in public. ECF No. 30, at 10.

It is not clear that the Second Amendment provides for the expansive reading that Mr. Marique proposes – that a person is covered by the Amendment so long as they allege they were

14

carrying a firearm, regardless of time, place and circumstance.  In *Heller*, the Court found that the natural meaning of "bear" for the purpose of the Second Amendment was to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person."  *Heller*, 554 U.S. at 584 (citing *Muscarello v. United States*, 524 U.S. 125, 143 (Ginsburg, J., dissenting)).  The *Heller* Court cited this definition in service of asserting an individual's right to bear arms outside of the context of military service.  *Heller*, 554 U.S. at 585-86.  As described in *McDonald*, the ultimate right recognized in *Heller* was the right to "possess a handgun in the home for the purpose of self-defense."  *McDonald*, 561 U.S. at 791.  *See also Bruen*, 142 S. Ct. at 2133 ("As we stated in *Heller* and repeated in *McDonald*, 'individual self-defense is 'the *central component*' of the Second Amendment right.'") (quoting *McDonald*, 561 U.S. at 767, *Heller*, 554 U.S. at 599).  In *Bruen*, the Court instructed lower courts to analyze whether a regulation "impose[s] a comparable burden on the right of armed self-defense."  *Bruen*, 142 S. Ct. at 2133.  Given this language, it is apparent the Court is primarily concerned about total prohibitions that leave individuals unable to have firearms for self-defense, particularly in – but not limited to – their homes.  *See id.* at 2135 ("Although we remarked in *Heller* that the need for armed self-defense is perhaps 'most acute' in the home, we did not suggest that the need was insignificant elsewhere." (internal citations omitted)).

While *Bruen* changed the applicable test, the opinion left room for states to regulate the types of weapons people could have and where they could have them.  For example, in *United States v. Hoover*, the court held that the Second Amendment did not protect the possession of unregistered firearm conversion devices, because the right therein does not protect weapons not typically possessed by law-abiding citizens for lawful purposes.  No. 3:21-cr-22(S3)-MMH-MCR,

2022 WL 10524008, at *13 (M.D. Fla. Oct. 18, 2022).  In so holding, the court relied on that fact

that *Bruen* did not overturn *Heller*, in which the Court recognized the importance of "the historical

tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" and noted that every

circuit that had addressed the issue post-*Heller* held that there was no Second Amendment right to

possess a machine gun.  *Id*.  This case suggests that *Bruen* did not create an unfettered Second

Amendment right to carry any type of firearm.

Congruently, *Heller* did not create an unfettered right to carry a gun anywhere.  Applying

*Heller*, the Fourth Circuit found limitations on carrying firearms in public to be permissible under

the Second Amendment using the two-step test common before *Bruen*.  *See Woollard*, 712 F.3d at

868 (upholding Maryland's requirement that one must have a "good and substantial reason" to

transport a weapon in public).  *Woollard* does not provide a concise definition of what constitutes

"public," either including or excluding government spaces.  Indeed, it is perhaps because of

*Heller*'s clear directive that few courts have addressed the constitutionality of regulating firearms

on government property.  *See Giraitis*, 127 F.Supp.3d 1; *Dorosan*, 2008 WL 2622996, discussed

*supra*.

While Mr. Marique cites to *Woollard* for the contention that any place outside of the home

is the "public" and thus protected by the Second Amendment, ECF No. 34, at 14, the court in

*Woollard* explicitly noted that the issue in that case was not as broad as Mr. Marique claims.

Instead, the court characterized the defendant's argument as something narrower – whether there

was a right to obtain a handgun permit "subject to lawful restrictions on carrying firearms in certain

public locations."  *Woollard*, 712 F.3d at 878, n.7.  The party challenging the restriction in

*Woollard* explicitly "acknowledge[d] that, included in the *Heller* Court's examples of

'presumptively lawful regulatory measures,' are 'laws forbidding the carrying of firearms in

sensitive places such as schools and government buildings.'"  *Id*.  This language, as well as the limited discussion associated with it, suggests a lack of controversy: after *Heller*, laws forbidding firearms on government property were broadly accepted as permissible.

This makes sense, given the narrower impact such laws have on individuals when compared with laws completely prohibiting the possession of firearms in any public or private space.  As the Supreme Court wrote in *Bruen*, the laws struck down in *Heller* and *McDonald* were total bans on firearms.  *See* 142 S. Ct. at 2131 ("One of the District's regulations challenged in *Heller* 'totally ban[ned] handgun possession in the home.'"); *McDonald*, 561 U.S. at 750 ("The city of Chicago (City) and the village of Oak Park, a Chicago suburb, have laws that are similar to the District of Columbia's, but Chicago and Oak Park argue that their laws are constitutional because the Second Amendment has no application to the States.").  Contrary to Mr. Marique's assertions, § 3.42(g) is not a total prohibition on firearm possession comparable in geographic scope to those the Court struck down in *Heller* and *McDonald*.  ECF No. 23, at 10.  Rather, § 3.42(g) operates as a partial restriction limiting the places in which a person can carry a firearm.  Mr. Marique points to no language in any of the decisions that suggests the right to bear defined in *Heller* includes a right to carry weapons onto federal property: such a contention falls directly in conflict with the language in *Heller* preserving firearm regulations in sensitive places.

*Bruen* does not alter the conclusion that the location the regulation affects remains relevant to assessing whether the Second Amendment covers the conduct.  While *Bruen* acknowledged that an individual's right to carry handguns for their self-defense extends, to some degree, to public spaces, 142 U.S. at 2134-35, as discussed above, the Court specifically exempted regulations barring the carrying of firearms in sensitive places.

Ultimately, although the plain text of the Second Amendment does not distinguish government buildings from the general public, the Court's express protection of laws preventing carrying firearms in sensitive places suggests that "a right to carry handguns publicly" may not extend to the highly regulated context of federal facilities.  As this case can be disposed of under prong two of the test in *Bruen*, I need not determine whether the plain text of the Second Amendment includes a right to carry firearms onto federal campuses like NIH.

### D.  § 3.42(g) is Consistent with Historical Regulations Preventing Carrying Weapons onto Government Property.

Even assuming the plain text of the Second Amendment covers Mr. Marique's conduct, his challenge fails because the Supreme Court has found laws like § 3.42(g) to be consistent with the nation's historical regulation of firearms.

The second step of the *Bruen* analysis is to determine whether § 3.42(g) is consistent with the United States' historical tradition of regulating firearms.  If a statute or regulation implicates conduct that is protected by the Second Amendment, then that statute is presumptively unconstitutional unless the Government can show that "it is consistent with the Nation's historical tradition of firearm regulation."  *Bruen*, 142 S. Ct. at 2130.

As noted above, Justice Thomas's majority opinion in *Bruen* reaffirmed *Heller* and *McDonald*: the government retains the ability to regulate firearms and prevent their carrying in certain sensitive areas, including, but not limited to, schools and government buildings.  Because there were "no disputes regarding the lawfulnesss" of prohibitions on carrying weapons in sensitive places like schools and government buildings, the Court concluded that "these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment."  *Id.* at 2133.  As the Court explained, the problem with the challenged law in *Bruen* was not that the State sought to apply the prohibition to a government building which lacked a

precise historical twin, but rather that the State attempted to rely on the sensitive places doctrine to prohibit the carrying of firearms in all public places. *Id.* at 2134 ("[E]xpanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly.").

Mr. Marique encourages a narrow viewing of this language, suggesting that the "sensitive places" doctrine is limited to sites that "host core government operations, such as legislative assemblies, polling places, and courthouses." ECF No. 23, at 20. This argument is based on a misreading of *Bruen*. While it is true that "legislative assemblies, polling places, and courthouses" are listed as sensitive places in *Bruen*, it does not follow that those are the only permissible sensitive places. Rather, the Court specifically listed those places as examples of historical analogues justifying the exclusion of firearms from schools and government buildings, and encouraged lower courts to engage in similar analogical reasoning when determining whether regulations affecting spaces beyond schools and government buildings are constitutionally permissible. *Bruen*, 142 S. Ct at 2133. In essence, the Supreme Court has already engaged in the analogical reasoning regarding schools and government buildings which Mr. Marique now asks this Court to conduct anew.

There is no language in any of the three major decisions that purports to limit the "sensitive places" doctrine, as Mr. Marique argues, to "core" government functions. Mr. Marique instead cites to, among other things, an amicus brief filed in *Bruen* by the Independent Institute suggesting that the early statutes focused on core functions of government. ECF No. 23, at 19 (citing *United*

*States v. Bruen*, No. 20-843, Brief for Independent Institute as *Amicus Curiae*, at 7).  However, that language was not incorporated into *Bruen*.[3]

 Even if it were, a closer review of the amicus brief reveals that it would not support Mr. Marique's case.  The Independent Institute distinguished between areas where the government conducts "core functions of government" and "zones where government bureaucrats conduct ministerial affairs" on the basis that the latter "do not provide comparable assurances of security as are typically seen in the latter."  ECF No. 30-2, at 7-8, n. 4; *see also id.* at 13 ("With America's Declaration of Independence from Britain, gun-free zones expanded slightly to meet the changing times. They were, however, still limited to areas in which the government provided the requisite security to compensate for the deprivation of the self-defense right.").  The NIH campus, as the United States explains, does provide such assurances of security.  NIH is a closed campus with limited entry points, each of which is monitored by police officials who inspect each vehicle upon entrance and allow entry only during certain time periods.  ECF No. 30-1, at 1-2; ECF No. 30-3, at 1-3.  As part of such, drivers are required to present their driver's license and open the trunk and/or hood of their car.  ECF No. 30-1, at 2.  Once on campus, employees and visitors must continue to wear their identification prominently at all times while on campus.  ECF No. 30-3, at 5.  Although Mr. Marique attempts to compare NIH to the areas at issue in *Bruen*, all areas of

---

[3] Likewise, Mr. Marique relies on unincorporated portions of a law review article which the Court in *Bruen* cited.  ECF No. 23, at 20.  According to the article, "bans that apply to all government buildings do not" have historical precedent.  *Id.* (quoting David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 205, 289 (2018)).  Again, regardless of what the article may have said, the Court in *Bruen* did not adopt this language or include this language in its decision.  Rather, even if relatively few places in the 18th and 19th centuries may have banned firearms altogether, the Court used analogical reasoning to conclude that prohibitions on firearms in sensitive places such as schools and government buildings are lawful.

public congregation, given the specific security measures at NIH, I cannot accept that these differences in security "make[] no difference". ECF No. 34, at 23.

Mr. Marique further suggests that the "sensitive places" doctrine is mere dicta and thus is not binding on lower courts. ECF No. 23, at 12. Mr. Marique is correct that some language quoted in *Bruen* can be categorized as dicta, and courts are "not bound by dicta or separate opinions of the Supreme Court." *Myers v. Loudoun Cnty. Pub. Schs.*, 418 F.3d 395, 406 (4th Cir. 2005). However, the Fourth Circuit has emphasized that "[w]e routinely afford substantial, if not controlling deference to dicta from the Supreme Court." *Hengle v. Treppa*, 19 F.4th 324, 347 (4th Cir. 2021) (citing *Manning v. Caldwell*, 930 F.3d 264, 281 (4th Cir. 2019) (en banc)); *McCravy v. Metro. Life. Ins. Co.*, 690 F.3d 176, 181 n.2 (4th Cir. 2012) ("[W]e cannot simply override a legal pronouncement endorsed just last year by a majority of the Supreme Court."). Contrary to Mr. Marique's assertions, the discussion of "sensitive places" is neither "peripheral" nor "cursory," but rather reflects the considered judgement of majorities in three Supreme Court opinions. *See* ECF No. 23, at 13 ("Where the Supreme Court's discussion of an issue is 'peripheral or 'cursory,' courts need not defer to it.") (citing *Hengle*, 19 F.4th at 347). The language addressing the constitutionality of regulations regulating the commercial sale of firearms could be similarly categorized as dicta, yet courts have upheld these and similar regulations on the basis of the Supreme Court's language.[4] *See Tilotta*, 2022 WL 3924282, at *3.

Given the clear language in *Bruen* and the consensus adopted by other district courts on comparable issues, there is no need for this Court to conduct an historical analysis anew. It is clear

---

[4] *See also Range*, 53 F.4th at 271 (upholding prohibition on possession of firearms based, in part, on similar language in *Heller*, *McDonald* and *Bruen*); *Price*, 2022 WL 6968457, at *8 ("Relying on the same dicta in the wake of *Bruen*, at least nine federal district courts have rejected constitutional challenges to Section 922(g)(1).").

that the Supreme Court has left undisturbed regulatory schemes preventing individuals from carrying firearms into government buildings such as the NIH campus. Accordingly, § 3.42(g) does not violate the Second Amendment.

## CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Mr. Marique's Motion to Dismiss be DENIED. A separate Order shall issue.

Date: December 14, 2022                           _____/s/_____

                                                                        Ajmel A. Quereshi
                                                                        United States Magistrate Judge